# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**EDISON JHON ALBA-CRUZ**

**CIVIL ACTION**

**v.**

**NO. 17-62-JWD-EWD**

**SHERIFF JASON ARD, AS THE PUBLIC ENTITY RESPONSIBLE FOR THE LIVINGSTON PARISH PRISON, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 42) by Defendant Sheriff Jason Ard. Plaintiff Edison Jhon Alba-Cruz opposes the motion. (Doc. 48.) Defendant has filed a reply. (Doc. 56.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, Defendant's motion is granted in full. No reasonable juror could conclude that Defendant intentionally discriminated against Plaintiff in violation of Title II of the Americans with Disabilities Act ("ADA") or the Rehabilitation Act ("RA"). Plaintiff never requested an accommodation. Further, though requests are not required if the disability, limitation, and necessary reasonable accommodation are open, obvious, and apparent, here the necessary reasonable accommodation was not obvious. That is, Defendant's employees reasonably believed that Plaintiff could understand the written instructions provided to him, and they had no indication that Plaintiff could not understand these instructions. Without more, Plaintiff cannot establish that Defendant's conduct rose to something more than deliberate indifference. As a result, Defendant is entitled to summary judgment, and Plaintiff's claims will be dismissed with prejudice.

## I. Relevant Factual Background

### A. Plaintiff's Background

Plaintiff Alba-Cruz is a profoundly deaf individual. (Pl. Ex. A 2, Doc. 51.) According to a September 20, 2011, Re-Evaluation conducted by the Louisiana School for the Deaf ("LSD"), the language Plaintiff most often uses at home is sign/American Sign Language ("ASL"). (Pl. Ex. A 4., Doc. 51.) Plaintiff also uses ASL to communicate with other students. (Pl. Ex. A. 4, Doc. 51.) The LSD noted Plaintiff's "limited exposure to English" and stated that Plaintiff's "inability to write coherently in English with his limited vocabulary inhibited his ability to respond to text through constructed response items." (Pl. Ex. A. 5, Doc. 51.) In summarizing the Re-Evaluation, LSD stated, "It is evident that Jhon's poor educational foundation continues to influence his educational performance, and it is questionable if he will be able to overcome years of substandard education in order to obtain a high school diploma." (Pl. Ex. A. 6–7, Doc. 51.) Plaintiff's strengths included, among other things, "[b]enefits from signed communication"; his "Curricular Adaptations/Modifications and Instructional Methods" listed, *inter alia*, "[p]rovide instruction via signed communication." (Pl. Ex. A. 7, Doc. 51. )

Plaintiff also submits the expert report of Nicky Gillies, an ASL interpreter and instructor. (Pl. Ex. G., Doc. 48-10; Pl. Ex. D, Doc. 48-7.) Gillies opines that ASL is not derived from English "but is in fact an entirely separate and equally complex language with its own unique grammar, syntax, and structure, as well as its own historical development." (Pl. Ex. D. 4, Doc. 48-7.) For example, "English often uses the basic sentence structure of 'subject, verb, object" while "ASL, in contract, typically uses the structure of 'object, subject, verb.' " (Pl. Ex. D 5, Doc. 48-7.) "A qualified ASL interpreter takes a message in one language, processes it for understanding, and decides on a highly accurate, equally detailed equivalent to that message in a

different language . . . Additionally, facial expressions in ASL serve a grammatical function, unlike English where they typically only express emotion." (Pl. Ex. D 5, Doc. 58-7.)   The report also explains how:

> Often, Deaf or Hard of Hearing individuals will nod when spoken to . . . in order to appear polite or compliant, or to expedite the frustrating interaction, even if they do not understand what's being said to them.  In addition to this phenomenon, in Deaf culture the person who is receiving communication (the listener we might call them in another context) often nods frequently or constantly throughout the communication event.  This typically signifies that the person is paying attention or trying to understand.  However, in mainstream, hearing culture, head nodding is often understood to mean agreement, understanding, or consent. . . . With a qualified interpreter present, the Deaf or Hard of Hearing individual can directly indicate their understanding or lack of understanding, and the interpreter can also make adjustments in signing style or vocabulary in order to better match the individual's own signing style and vocabulary.

(Pl. Ex. D 6–7, Doc. 58-7.)  Lastly, Gillies stated, "Nationally, Deaf and Hard of Hearing high school graduates have been proven to have extremely low levels of English literacy", so, "[f]or this reason, written communication in English is not and should not be assumed to be equivalent to signed communication in ASL through a qualified interpreter." (Pl. Ex. D 6, Doc. 58-8.)

### B.  Plaintiff's Arrest and the Parish's Temporary Booking Facility

This case arises from Plaintiff's arrest and subsequent processing at a temporary facility in Livingston Parish.  This incident is the first and only time Plaintiff has been arrested. (Pl. Dep. 84:9–14, Doc. 48-2.)

Specifically, on September 3, 2016, Livingston Parish Sheriff's Deputy Christian Williams was dispatched to the scene of a domestic disturbance. (Defendant's *Local Rule 56(a) Statement of Undisputed Material Facts* ("*DSUMF*") ¶ 1, Doc. 42-2; *Plaintiff's Statement of Contested / Uncontested Facts* ("*PSCUF*") ¶ 1(a), Doc. 48-1.)   Williams testified that, upon arrival, he made contact with Jonathan Merritt, who informed him that he was hit several times

by his son, the Plaintiff, and that Plaintiff had also hit his sister, Vanessa Alba-Cruz, in the eye. (Williams Decl. ¶ 3, Doc. 42-3.)  Williams stated that Merritt informed him that Plaintiff is deaf. (Williams Decl. ¶ 3, Doc. 42-3.)

Williams made contact with Plaintiff, placed him in handcuffs, and then put him in Williams' patrol car without incident. (Williams Decl. ¶ 4, Doc. 42-3.)  Williams took a voluntary statement from Merritt, who said that he saw Plaintiff pushing Vanessa Alba-Cruz and then punch her in the face. (Williams Decl. ¶ 5, Doc. 42-3.)  Williams also said that, when Plaintiff went to punch Vanessa again, Merritt grabbed Plaintiff's hand, at which time Plaintiff hit Merritt in the face. (Williams Decl. ¶ 5, Doc. 42-3.)  Williams observed "a fresh and bloody scratch mark on the right side of Mr. Merritt's face." (Williams Decl. ¶ 5, Doc. 42-3.)  Williams next spoke to Vanessa, who said that she and her brother (the Plaintiff) "had an altercation via sing (sic) language at which time he became increasingly mad" and "starting pushing her and punched her in the eye." (Williams Decl. ¶ 6, Doc. 42-3.)  Williams observed bruises to Vanessa's eye. (Williams Decl. ¶ 6, Doc. 42-3.)

William attests that he then talked with Merritt again and informed him that Plaintiff was being arrested for domestic abuse battery, which required that a temporary restraining order be issued against Plaintiff that would prevent him from living at the residence. (Williams Decl. ¶ 7, Doc. 42-3.)  Merritt expressed his understanding. (Williams Decl. ¶ 7, Doc. 42-3.)

Plaintiff, on the other hand, testified that he gestured to Williams that he was deaf and that some of the family told Williams he was deaf, but, "What they all talked about, I have no clue." (Pl. Dep. 28:16–21, Doc. 48-2.)  Plaintiff stated that he "couldn't communicate at all." (Pl. Dep. 29:6–8.)

According to Williams, after his investigation into the incident, he transported Plaintiff to the Livingston Parish Courthouse, where he was charged with simple battery and domestic abuse battery. (Williams Decl. ¶¶ 4–8, Doc. 42-3.)  The Livingston Parish Courthouse was operating as a temporary booking facility for individuals arrested by the Livingston Parish Sheriff's Office due to the unavailability of the Livingston Parish Detention Center. (*DSUMF* ¶ 3, Doc. 42-2; *PSCUF* ¶ 3(a), Doc. 48-1.)   Specifically, at the time of Plaintiff's arrest, the Livingston Parish Detention Center had experienced substantial damage during the floods that inundated Livingston Parish in August of 2016. (*DSUMF* ¶ 3, Doc. 42-2; *PSCUF* ¶ 3(b), Doc. 48-1.) Accordingly, the Detention Center was not housing inmates. (*DSUMF* ¶ 3, Doc. 42-2; *PSCUF* ¶ 3(c), Doc. 48-1.)  Williams testified that all arrestees were transported to the temporary booking facility at the Livingston Parish Courthouse for processing, and were placed in temporary holding cells for a short time before being transported to another detention facility for housing. (Williams Decl. ¶ 10, Doc. 42-3.)

### C. Beginning of Plaintiff's Booking And the Initial Arrest Report and Prisoner Booking and Property Record

In his deposition, Warden Perry Rushing, who testified as a corporate deponent on behalf of Sheriff Ard and his office (Rushing Dep. 5:17–21, Doc. 48-3), explained that, at various points after the flood, parts of the booking process were implemented which included filling out booking sheets and property sheets (with the collection of property).  (Rushing Dep. 15:2–17:25, Doc. 48-3.)

 Williams testified that, upon his arrival at the temporary booking facility, he notified the deputies working in the booking station and the nurse that Plaintiff was deaf. (Williams Decl. ¶ 11, Doc. 42-3.)

During the booking of Plaintiff, Deputy Williams completed an Initial Arrest Report and Prisoner Booking and Property Record. (*DSUMF* ¶ 5, Doc. 42-2; *PSCUF* ¶ 5(a), Doc. 48-1.) This form is generally filled out by the arresting officer. (Rushing Dep. 12:17–18, Doc. 48-3.) This document has space to write in the arrestee's name and the charges against him and lists several rights, including a prisoner's *Miranda* rights and the following: "You have the right to one telephone call, after you have completed the Booking Procedure." (Pl. Ex. H, Doc. 48-11.) At the bottom is also a signature block, above which is the statement, "I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE INSTURCTIONS AND MY RIGHTS." (Pl. Ex. H, Doc. 48-11.)

Williams testified that he was able to obtain all of the information needed to complete the Initial Arrest Report and Prisoner Booking form by using hand gestures (such as pointing) and written notes with Plaintiff. (Williams Decl. ¶ 12, Doc. 42-3.) Williams elaborated that he was specifically able to obtain Plaintiff's social security number and emergency contact information by pointing to those sections of the form, and Plaintiff wrote down the information for Williams. (Williams Decl. ¶ 12, Doc. 42-3.) Williams testified: "As a general practice, I do not ask for any person arrested by me to sign the initial Arrest Report and Prisoner Booking and Property Record, and I did not ask [Plaintiff] to do so." (Williams Decl. ¶ 13, Doc. 42-3.)

Further, Williams also stated that he believed plaintiff was able to read and understand written English since he provided appropriate responses. (Williams Decl. ¶ 14, Doc. 42-3.) Plaintiff disputes this, and this issue will be explored further below.

Defendant also points to some of Plaintiff's testimony in support of his position. Plaintiff was asked if the deputy "ever tried to force him to read his lips or understand him without an

interpreter," and Plaintiff responded, "No." (Pl. Dep. 30:19–22, Doc. 48-2.)   Plaintiff further

testified:

> Q.      Did you ever write anything to the deputies? . . . . All of the questions I'm
> asking right now, I'm asking about when you were brought to Livingston
> immediately after your arrest, before you were brought anywhere else.  At
> that time, did you write any notes or questions to the deputies?
>
> A.      Really, I would say they asked me for my phone number.  . . . The police
> asked me for my phone number, and I gave it to them.  Second, they just
> asked me, like, little simple things – police.  It was short, like not elaborate,
> like Social Security number, SSN, and I wrote that down.  How old are you?
> Age – they put 'age,' and I told them my age; and then they asked me about
> medicine, and it was a whole paragraph there.  I really wasn't too sure about
> what they were asking, so – and that was it.
>
> Q.      Did you ever tell them that you could not read?
>
> A:      No. I don't know if I told them.  I just said, "IDK," I don't know.  They'd
> show me something, and I'd say, "IDK," I don't know.
>
> Q.      Did you ever tell them, "I don't understand"?
>
> A.      Really not. I mean, I just put, "IDK," and "I don't know."  I don't know
> what – I don't know how to read.  I mean, I don't know how to read.  I don't
> know.

(Pl. Dep. 37:5–38:22, Doc. 48-2.)

Meanwhile, Plaintiff points to other testimony.  Specifically, Plaintiff testified that, when

he got to the facility in Livingston, "they started talking to [him] and then [he] [thought]

probably – then the police talked amongst themselves." (Pl. Dep. 32:14–16, Doc. 48-2.)  Plaintiff

continued: "I think they may have told them that I was deaf or something like that because I was

just kind of sitting there.  They asked me to write, and I showed them the cuffs.  And then they

asked me, like, my Social Security number and, like, if I had any medications or allergies, and I

just put, I don't know; I don't know.  I didn't know my Social Security number." (Pl. Dep.

32:14–23, Doc. 48-2.) According to Plaintiff, Williams brought in a little note and wrote, "You're deaf," and showed it to Plaintiff, as a question, "Are you deaf?" (Pl. Dep. 43:14–17, Doc. 48-2.) Plaintiff "shook [his] head, 'Yes, deaf,' okay?" (Pl. Dep. 43:18–21, Doc. 48-2.)

Plaintiff contends that he was unable to write his Social Security number and refers to certain testimony in which Plaintiff indicated that he did not know and the deputies "had a facial expression and went off, didn't say anything more." (Pl. Dep. 40:10–15, Doc. 48-2.) But Plaintiff testified shortly thereafter that a deputy "asked for [Plaintiff's] Social Security number, so [Plaintiff] wrote that[.]" (Pl. Dep. 43:23–44:11, Doc. 48-2.)

Plaintiff also responds by submitting a document titled "Initial Arrest Report and Prisoner Booking and Property Record" which has an "X" by the signature line. (Pl. Ex. C., Doc. 48-6.) In response to Williams' statement that he did not ask Plaintiff to sign the document, Plaintiff focuses on Warden Rushing's testimony in which he said it was the "official position of Sheriff Jason Ard" that it was "best practice" for the form to be signed. (Rushing Dep. 32:22–33:2, Doc. 48-3.) However, as Defendant correctly argues, "plaintiff has no evidence to establish where this 'x' came from or who wrote it. He cannot prove that a Sheriff's Deputy put the "'x' on the form or for what purpose. Nor does he submit any evidence to establish that this form was ever even shown to plaintiff." (Defendant's *Reply Memorandum in Support of Motion for Summary Judgment*, Doc. 56 at 5.)

Plaintiff also states in his affidavit that certain things were not explained to him during booking, including a "brief statement of the charges against me", his *Miranda* rights, his right to a preliminary examination, his "right to make one telephone call after I complete the booking process", and his ability to authorize Ard to release his medical records. (Pl. Aff. ¶ 5, Doc. 48-9.) Plaintiff further said: "To the extent a Sheriff deputy attempted to explain the above information

[(regarding his rights on the booking form)], said hand gestures were not in American Sign Language and did not provide me with any explanation of my rights." (Pl. Aff. ¶ 6, Doc. 48-9.)

### D. Booking and Plaintiff's Property

Additionally, Livingston Parish Sheriff's Deputy Jean Hotard received and cataloged Plaintiff's personal property upon booking. (*DSUMF* ¶ 8, Doc. 42-2; *PSCUF* ¶ 8(a), Doc. 48-1.) Hotard testified that this process involves preparing an Arrestee Property Transfer Inventory form, which documents the personal property taken from all arrestees during booking. (Hotard Decl. ¶ 5, Doc. 42-4.) While performing this process with Plaintiff, Hotard cataloged each item of person property taken from Plaintiff and documented it on the Arrestee Property Transfer Inventory form. (*DSUMF* ¶ 8, Doc. 42-2; *PSCUF* ¶ 8(c), Doc. 48-1.) As Hotard cataloged each item, he pointed to its description for Plaintiff to read. (Hotard Dec. ¶ 6, Doc. 42-4.) When Hotard completed the task of cataloging Plaintiff's personal property, Hotard signed the form near the bottom and gestured for Plaintiff to do the same. (*DSUMF* ¶ 8, Doc. 42-2; *PSCUF* ¶ 8(e), Doc. 48-1.) Hotard stated that Plaintiff "signed the form without indicating that he could not read or understand its contents or purpose." (Hotard Decl. ¶ 6, Doc. 42-4.) Hotard then said: "When I completed the cataloging of Mr. Alba-Cruz's personal property, I signed the form near the bottom and gestured for Mr. Alba-Cruz to do the same. Mr. Alba-Cruz signed the form without indicating that he could not read or understand its content or purpose." (Howard Decl. ¶ 7, Doc. 42-4.)

Plaintiff points to other testimony from Rushing concerning booking and Plaintiff's property. Specifically, Rushing stated that property sheets were completed during a typical process. (Rushing Dep. 17:23–25, Doc. 48-3.) Rushing further testified, when asked what was explained to inmates about the purpose of the sheet, that he didn't "know if we explain anything

to inmates about the purpose of a property sheet." (Rushing Dep. 18:1–5, Doc. 48-3.) Rushing continued: "If they ask, they are told that those items are removed from them because they were prohibited from being kept in the facility." (Rushing Dep. 18:6–8.) After explaining that certain property was taken from inmates, Rushing was asked if anything was told to the inmates about what would happen to the collected items, and Rushing said: "I'm not sure that each time a deputy says we are going to hold this until you get out of jail. Some of them understand that, I think, without being told. But I can't tell you each individual case if they do a detailed explanation that's going on with the property." (Rushing Dep. 18:17–19:1, Doc. 48-3.) Rushing further said that he could not recall there being a policy that addresses what is supposed to be explained when items are taken. (Rushing Dep. 19:2–6, Doc. 48-3.) According to Plaintiff's argument, "[t]he natural inference from Jason Ard's corporate deposition . . . is that a segment of arrestees are provided with a detailed explanation [of] what's going on with the property." (*PSCUF*, Doc. 48-1 ¶ 8(b).) Plaintiff also points to the lack of training, which will be discussed below.

### E. Completion of Plaintiff's Time in Custody and Plaintiff's Request for an Accommodation

The parties agree that Plaintiff was held at the Livingston Parish Courthouse for only "a short time," which he estimated to be eight to nine hours. (*DSUMF* ¶ 10, Doc. 42-2; *PSCUF* ¶ 10, Doc. 48-1.) Further, both sides acknowledge that Plaintiff was then transferred to Tangipahoa Parish, then to Catahoula Parish for housing, since the Livingston Parish Detention Center was unavailable. (*DSUMF* ¶ 10, Doc. 42-2; *PSCUF* ¶ 10, Doc. 48-1.) The parties further agree that Plaintiff returned to Livingston Parish for a brief time to gather his property upon being released from custody and that Plaintiff was not asked to sign any paperwork at this time. (*DSUMF* ¶ 11, Doc. 42-2; *PSCUF* ¶ 11, Doc. 48-1.)

And, importantly, both parties agree that "[a]t no time during his arrest, booking, or detention by the Livingston Parish Sheriff's Office did [Plaintiff] request a sign language interpreter (or any other auxiliary aid)." (*DSUMF* ¶ 12, Doc. 42-2; *PSCUF* ¶ 12, Doc. 48-1.)

### F. Plaintiff's Indication That He Could Not Understand the Deputies

Equally critical, the parties dispute whether Alba-Cruz ever gave an indication that he could not read or whether it appeared that he was having difficulty communicating effectively. Specifically, Williams testified that, "At no time during [Plaintiff's] arrest or the booking process did Mr. Alba-Cruz make any indication to [Williams] or any other person that he could not read written English." (Williams Decl. ¶ 14, Doc. 42-3.) Williams continued: "In fact . . ., [Williams'] interactions with [Plaintiff], and specifically his ability to read the information I needed on the Initial Arrest Report and Prisoner Booking and Property Record, caused [Williams] to believe that he was able to read and understand written English since [Plaintiff] provided appropriate responses." (Williams Decl. ¶ 14, Doc. 42-3.) Williams also said that "At no time during his arrest or the booking process did [Plaintiff] make any indication to [him] or any other person that he did not understand why he was arrested or the booking process, nor did it appear to [Williams] that [Plaintiff] did not understand what was being communicated to him." (Williams Decl. ¶ 15, Doc. 42-3.) Williams emphasizes that at no time did Plaintiff request a sign language interpreter, a specific auxiliary aid for communication, a telephone call, the use of a video phone, or the use of a TTY machine. (Williams Decl. ¶¶ 16–19, Doc. 42-3.) And, at no time during the arrest or booking process did Williams believe that Plaintiff did not understand the process or procedure, including the documents provided to him. (Williams Decl. ¶ 20, Doc. 42-3.) Further, "At all times during [Williams'] interactions with [Plaintiff], and during the interactions [Williams] witnessed between [Plaintiff] and other employees of the Livingston

Parish Detention, [Williams] believed that [Plaintiff] was able to effectively communicate through hand gestures and written words." (Williams Decl. ¶ 21, Doc. 42-3.)

Hotard provided substantially similar testimony as Williams. (Hotard Decl. ¶¶ 8–14, Doc. 42-4.) This included the following specific statements:

> At no time during the booking process did Mr. Alba-Cruz make any indication to me or any other person that he could not read written English. To the contrary, at all times it appeared to me that he understood the property inventory process. Based on these interactions, I believed Mr. Alba-Cruz was capable of reading written English.
>
> At no time during his arrest or the booking process did Mr. Alba-Cruz make any indication to me or any other person that he did not understand the booking process, nor did it appear to me that he did not understand what was being communicated to him.

(Hotard Decl. ¶¶ 8–9, Doc. 42-4.)

Defendant also points to Plaintiff's own testimony to support his argument that Plaintiff gave no indication that he could not read. Specifically, Plaintiff was asked, "Did you ever tell a deputy, 'IDK'?", and he responded, "No. To the doctor – to the doctor." (Pl. Dep. 46:3–4.) Plaintiff was also asked, when he was with Livingston, "Never told anyone that you couldn't read at that time, right?", and Plaintiff replied: "No." (Pl. Dep. 52:17–53:7.) Similarly, he was asked elsewhere, "Did you ever tell any of the deputies in Livingston that you did not know how to read?", and Plaintiff replied, "No." (Pl. Dep. 45:14–16, Doc. 48-2.) Plaintiff testified further:

> Q.   So when you came back to Livingston, did you ever tell a deputy you couldn't read? I think you answered that question already.
>
> A.   No.
>
> Q.   When you came back to Livingston, did you have – were you given any paperwork that you didn't understand?
>
> A.   No.

(Pl. Dep. 54:11–18, Doc. 42-5.)

Plaintiff maintains that he could not understand. In response to Williams and Hotard's statements that Plaintiff could understand, Plaintiff points to Warden Rushing's testimony that the LPSO had "[n]o specific training that [Rushing] can tell" about with respect to "assessing whether an individual who is deaf is able to read a document" (Rushing Dep. 48:22–49:2.)[1] Plaintiff also points to the unsigned form with the written "X" on it as evidence that he did not understand. Lastly, Plaintiff refers to the following testimony from his own deposition:

> Q.    You told us that they had forms with name, Social Security number, that they showed you. Did they ever write out any notes to you – the deputies?

---

[1] The full context of this quote is as follows:

> Q.    There are several about training on here. I'm just asking a general question about -- I can find one that covers this.
>
> A.    Well, very limited training, but we have always been able to successfully communicate with people who have disabilities or limitations. We have assessed different situations and gotten resources there to make the communications occur.
>         First line deputies are trained to do their best to effectively communicate. When they have an issue, they bring it to their supervisor. The supervisor addresses it. It may involve bringing it to me, but we work these problems out.
>
> Q.    You say very limited training, but it does sound like maybe there was some?
>
> A.     I can't articulate a specific class or anything in writing. I can tell you that that refers to it. A lot of it is based on the needs at the time.
>
> Q.     What about assessing whether an individual who is deaf is able to read a  document? What sort of training is provided as to assessing reading ability?
>
> A.    No specific training that I can tell you about.
>
> Q.    Is it the official position of Sheriff Jason Ard that Mr. Williams, Deputy Williams,  had any additional training beyond what we just discussed?
>
> A.    None that I can identify.

(Rushing Dep. 48:1–49:7, Doc. 48-3.)

A.    No. Mostly, they just came in, left, came in and left, gave me that little piece of paper, found my name, asked me my Social Security number, came in, left again. Just my name and stuff, address.

Q.    And the information that the deputies were asking, you understood that, correct?

A.    Yes, I understood that. I mean, just simple -- you know, "S-S-N," "n-a-m-e," you know, name, those were very simple, basic words.

Q.    And we're still talking about the time that you were brought to Livingston right after the arrest. During that time, did you ever ask for an interpreter?

A.    I didn't know. I mean, I was just standing there. They left, and I didn't know. They brought me a little paper, and they told me to come sit. They came in and left, came in and left. And I should have maybe gotten paper, but I didn't have any way to do that and communicate. So I just sat there and slept.

Q.    Did you ever write a note saying, "I need an interpreter"?

A.    No. They didn't ever stay long enough, and they closed the door and left me there.

(Pl. Dep. 47:4–48:7, Doc. 48-2.)

Plaintiff also points to certain other testimony from Rushing concerning the deputies' explanation of documents:

Q.    What about asking for providing a basic explanation as to the document? Is that prohibited under the sheriff's policy? .. .

A.    That could cover a lot of different topics.

Q.    I guess what is in the sheriff's office the definition of providing legal advice?

A.    Should I plead guilty to this charge? Should I get an attorney? I always recommend, yes, get an attorney. Don't ask me. Get an attorney. That's my position to encourage or the policy of the sheriff's office.

Q.    I guess my next question is at what point would it be considered providing a general explanation about a document would it go into inappropriate legal advice, whether there is an official sheriff policy on that? . . .

THE WITNESS: I'm not real sure what you are talking about there. I don't know where to tell you the line is. We try to explain documents, what they are, but stay out of the legal part of it. That's the best way I can explain it. . . .

Q.      Can you explain what you mean by we try to explain documents and what they are?

A.      Okay. What is this form? That's a property release form.

Q.      Would that be prohibited?

A.      Would it be prohibited for us to tell an inmate if it was a property release form?

Q.      That level of explanation?

A.      No. That's acceptable.

(Rushing Dep. 69:24–71:19, Doc. 48-2.)

Interestingly, both parties point to parts of the following testimony:

Q.      At Livingston, they were asking you to sign papers?

A.      Yeah. They were talking. I didn't know. They had kind of an attitude. They looked, like, mean and angry, and they just kept going, here, sign this, sign this. So I didn't know what I was signing because I couldn't read it. And it was all long, and they didn't explain any of it to me. So I just sat there, and then they left.

Q.      Did you ever inform the deputy that you didn't understand the paper?

A.      No. I mean, they just gave me the papers and looked like we were late or something, and they needed me to sign those things; and then he left.

Q.      Did you ever write any notes to the deputies while you were at Livingston Parish?

A.      No. No, I didn't have anything. I mean, it was, what was I going to write with or write on.

Q.      Did you ever ask for paper or a pen to write a note on?

A. No. They just kind of ignored me. You know, I didn't know how to really communicate with them. They closed the door, and I couldn't see them.

(Pl. Dep. 50:1–24.) But, as Defendant stresses, Plaintiff testified elsewhere that he was able to write the sentences "I cannot read," "I do not understand," and "I need an interpreter." (Pl. Dep. 23:7–24:8, Doc. 48-2.)

### G. Plaintiff's Use of a Telephone

Again, Williams emphasizes that at no time did Plaintiff request a sign language interpreter, a specific auxiliary aid for communication, a telephone call, the use of a video phone, or the use of a TTY machine." (Williams Decl. ¶¶ 16–19, Doc. 42-3.) Hotard provided substantially similar testimony as Williams on this point. (Hotard Decl. ¶¶ 8–14, Doc. 42-4.)

Likewise, Rushing could not guarantee that, after the August 13, 2016, flood, inmates had "consistent access to telephones." (Rushing Dep. 21:5–18, Doc. 48-3.) That said, Plaintiff highlights that Rushing stated that, with respect to telephone calls, "things had normalized somewhat by that point. Inmates were given phone calls or the ability to make phone calls . . . at the temporary facility." (Rushing Dep. 21:21–22:6, Doc. 48-3.) With respect to whether Plaintiff was given the opportunity to make a telephone call using a video remote interpreting device, Rushing said:

> To my knowledge, he never asked for such a phone call. The video relay system got flooded in the detention center. However, we have numerous resources that were made available to us from other agencies during this time, and as needs arose we would submit those needs to the Office of Emergency Preparedness and they would see if those needs could be filled. To my knowledge, Mr. Cruz never -- Mr. Alba-Cruz never requested such equipment to make a phone call. . . . To my knowledge , he never asked. So we never to my knowledge sought out a TTY or a VRS or any other form of communication because he never requested it.

(Rushing Dep. 23:7–18; 24:19–22, Doc. 48-3.)

Defendant also points to Plaintiff's own testimony. Plaintiff specifically stated that he did not ask any Livingston deputies for a TTY machine or a video phone, saying "I really didn't see anybody. . . . [I]n Livingston, I didn't really see anybody to do that. I don't know." (Pl. Dep. 66:1–25, Doc. 48-2.)

Elsewhere, Plaintiff was asked whether he ever requested to make a phone call while he was at Livingston Parish. (Pl. Dep. 49:14–15, Doc. 48-3.) Plaintiff responded:

> No. They just put me in that isolation area. And you understand -- okay. Understand, in the morning -- early morning, they were like, hurry up, hurry up, hurry up. They had a whole stack of papers, and I didn't know. They said, hurry up, sign this, sign this, sign this, and then I left. The police just were like, hurry up, hurry up. And their facial expressions were like, here, here, come on, come on, here. So, I mean, I just kept signing things.

(Pl. Dep. 49:16–25, Doc. 48-3.) As to Williams, Plaintiff argues: "Deputy Williams does not explain *how* Mr. Alba-Cruz should have made such a request without an interpreter or ability to use his hands. Nor does Deputy William[s] explain *why* Mr. Alba-Cruz would have independently known that he had the right to a phone call." (*PSCEF* ¶ 67, Doc. 48-1.) Plaintiff also argues that Defendant has shown no evidence that he attempted to secure a sign language interpreter or Video Remote Interpreter but was prevented from doing so by exigent circumstances. (*PSCUF* ¶¶ 97–98, Doc. 48-1.) Plaintiff also contends that there is no evidence that Defendant did "anything to accommodate [Plaintiff] using the 'numerous resources that were made available to use from other agencies.' " (*PSCUF* ¶ 99, Doc. 48-1.)

## H. Livingston's Request for Catahoula to Obtain Plaintiff's Signature for the Order of Protection

With respect to Plaintiff's time at Catahoula Correctional Center (*see DSUMF* ¶ 10, Doc. 42-2; *PSCUF* ¶ 10, Doc. 48-1), Defendant asserts: "There is absolutely no evidence to establish that there was any contract, license, or other arrangement between Sheriff Ard and Sheriff

Edwards to discriminate against citizens, or that there was never any direction by Sheriff Ard to Sheriff Edwards to commit a discriminatory act." (*DSUMF* ¶ 16, Doc. 42-2.)

Plaintiff responds by pointing to the Order of Protection issued from the 21st Judicial District Court protecting Jonathon E. Merritt from Plaintiff. (Pl. Ex. E, Doc. 48-8.)  The first page of the document is a fax cover sheet from Livingston to Catahoula, is dated September 7, 2016, is marked "For Review," and contains the following message: "PLEASE HAVE INMATE EDISON ALBA-CRUZ SIGN ON THE LAST PAGE OF PROTECTIVE ORDER AND FAX BACK. THANK YOU". (Pl. Ex. E 1, Doc. 48-8.)  Plaintiff emphasizes that "Defendant Ard did not provide instructions regarding the provision of an interpreter in his correspondence." (*PSCUF* ¶ 77, Doc. 48-1.) Plaintiff also reasonably infers from the time stamp on the bottom of the page ("Sep. 7 2016 8:47 AM No. 0330") and from the top of the page ("Sep. 7 2016v10:51AMHERIFF TAX OFFIC") that the fax was sent by LPSO to Sheriff Edward's office on September 7, 2016, at 8:47 a.m., and faxed back to LPSO at 10:41 am after Plaintiff signed the Order of Protection. (*See PSCUF* ¶ 79, Doc. 48-1.)

The remaining six pages are the Order of Protection (Pl. Ex. E 2–7, Doc. 48-8.)  This Order also contained a number of specific directives protecting Merritt from Plaintiff and was signed by Judge Jeffrey S. Johnson on September 6, 2016. (Pl. Ex. E 4–5, Doc. 48-8.)  The last page contains a certification at the top stating, "I have read and fully understand all conditions of the above orders, and I accept and agree to comply with all conditions and penalties herein."  (Pl. Ex. E 7, Doc. 48-8.)  A line marked "DATE" and a signature line with "SIGNATURE OF DEFENDANT"  are both provided with written "X"s next to them.  The document is dated "9-7-16", and a signature appears next to it (Pl. Ex. E 7, Doc. 48-8.)  Rushing said he had no reason to doubt that it was Plaintiff's signature. (Rushing Dep. 45:11–24, Doc. 48-3.)   Further, Plaintiff

executed an affidavit in which he swore that, though he said his deposition that he did not

execute the document at Catahoula Correctional Center, the signature on the Order of Protection

is consistent with his signature, and reviewing the document refreshed his memory that he was

asked to sign the document with no sign language interpreter provided and without the

opportunity to ask questions about the document. (Pl. Aff. ¶¶ 8–10, Doc. 48-9.)

      Plaintiff also refers to Rushing's testimony. Specifically, Rushing said that, "When a

person is accused of certain crimes, domestic violence, the law requires that an order of

protection be issued and served on the accused." (Rushing Dep. 38:23–39:1, Doc. 48-3.)

Rushing said they "were complying with the law by sending him to Catahoula where the accuser

was located and having service made on him and having him sign it." (Rushing Dep. 39:2–5,

Doc. 48-3.) Further, "[i]n other cases, inmates have been served with this when they are

arrested for domestic violence. Deputies do bring this to them and have them sign it." (Rushing

Dep. 39:18–21.) Rushing was asked whether sending the fax to Catahoula Parish and asking

Catahoula to sign the document was "standard practice for Livingston Parish when an inmate is

in another parish", and Rushing replied, "It can be, yes." (Rushing Dep. 39:23–40:12, Doc. 48-

3.) Rushing was asked to explain what he meant by that, and he responded:

> Well, if they are in a parish quite a distance away, which is Catahoula, we have
> done this before, send a fax up there, have them have the inmate sign it, and then
> return it to us. Sometimes deputies are driving to that facility for various reasons,
> transferring an inmate. They may bring the paper with them and have the inmate
> sign it. But generally the fax is the way we do it.
>
> In certain cases, the inmate is given this before he is transferred. That's the
> preferable method.

(Rushing Dep. 40:14–41:2.)

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .   [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## III.    Discussion

### A.  Parties' Arguments

#### 1. Defendant's Memorandum in Support (Doc. 42-1)

Defendant focuses on the fact that, to recover compensatory damages under the ADA or RA, a plaintiff must demonstrate intentional discrimination.   According to Defendant, the Fifth Circuit has not provided a clear definition of intentional discretion, but it is one of two

approaches: (1) deliberate indifference (as in, "the defendant *knew* that harm to a federally protected right was substantially likely and . . . *failed* to act on that likelihood"), or (2) "discriminatory animus . . . [that is] prejudice, spite, or ill will." (Doc. 42-1 (citations omitted).) Defendant maintains that Plaintiff fails under either standard.

Defendant further asserts that the ADA requires that a defendant be made known of the physical or mental limitations of the individual with a disability rather than just the disability itself. Defendant urges that, under case law, the ADA's reasonable modification requirement only applies if triggered by a request. That is, Plaintiff must show that Defendant knew of the disability *and* the physical or mental limitations resulting from the disability.

Defendant argues that Plaintiff cannot satisfy his burden for two reasons: (1) he was not "denied the benefits of services, programs, or activities or otherwise discriminated against while in the custody of LPSO," and (2) he was not "subjected to intentional discrimination". (Doc. 42-1 at 10.)

Defendant asserts that Plaintiff gave no indication that he did not understand the booking process, why he was arrested, or what was being communicated to him. According to Defendant's witnesses, deputies adequately communicated to him through hand gestures. Further, Plaintiff admits that he never requested a sign language interpreter or other auxiliary aid while in custody, nor did he ask for a telephone call, video phone, or TTY machine. Again, Plaintiff was not treated differently from others arrested and processed, and he was not intentionally discriminated against because of his disability. Plaintiff also gave no indication that he could not read. The deputies wrote down "simple little words", and Plaintiff stated that he could understand such simple written statements (e.g., asking for his name, phone number, and social security number). Defendant maintains that Plaintiff's "need for an alternative

accommodation was neither obvious or known since it appeared to everyone with whom he interacted that he could read and understand written English," so the reasonable accommodation requirement was not triggered.

Defendant analogizes this case to two others—*Spurlock v. Simmons*, 88 F. Supp. 2d 1189 (D. Kan. 2000) and *Hans v. Board of Shawnee County Commissioners*, No. 16-4117, 2018 WL 1638503 (D. Kan. Apr. 5, 2018), *on appeal*. According to Defendant, in the former, the Court dismissed ADA and RA claims for a prisoner who claimed to need an interpreter because there was no evidence that plaintiff requested an interpreter or had difficulty communicating with the prison staff. In the latter, the Court found no deliberate indifference in how officers dealt with a deaf inmate because of their attempts to communicate with him effectively.

Defendant also notes that, during the events of this suit, Livingston Parish was still recovering from the Great Flood. "[T]he Livingston Parish Detention Center had been flooded, and the deputies were processing arrestees in a temporary booking facility with whatever equipment and materials they could make available." (Doc. 42-1 at 18.) Defendant urges that this is critical because accommodations need only be reasonable, not ideal. Here, under the totality of the circumstances, Plaintiff's accommodations were reasonable.

Lastly, Defendant attacks Plaintiff's claim that he is liable for faxing a form to the Catahoula Correction Center asking Plaintiff to sign a document. Plaintiff points to a ADA regulation stating that "a public entity, in providing any aid, benefit, or service, may not directly or through contractual, licensing, or other arrangements, discriminate against individuals with disabilities." (Doc. 42-1 at 19 (citing 28 C.F.R. § 35.130(b)(1)).) Defendant responds that there was no such arrangement between Sheriff Ard and Sheriff Edwards, and no direction to commit a discriminatory act. "All that was requested by LPSO was that CCC have plaintiff sign a

protective order that has been issued by the 21st Judicial District Court. LPSO did not issue the order and did not require plaintiff to sign it; the Court did. LPSO was simply the entity that sent the fax to CCC." (Doc. 42-1 at 19.) Further, Defendant disputes Plaintiff's theory that Defendant should have directed Sheriff Edwards to provide an interpreter, as (1) Defendant had not duty to do so, (2) Plaintiff's disability was "surely obvious", (3) "Sheriff Ard has no authority to direct Sheriff Edwards as to how he could manage the inmates incarcerated at CCC, including how to reasonably accommodate disabilities," and (4) "no agent or representative of Sheriff Ard had any knowledge or indication that plaintiff could not read written English," so there was no reason to inform Sheriff Edwards of the need for an interpreter or auxiliary aid. (Doc. 42-1 at 20 (emphasis omitted).)

In sum:

> [T]he deputies recognized that the plaintiff was deaf and attempted to communicate with him in writing. Plaintiff was able to respond to the written requests of the deputies and provide them with the information requested. Further, plaintiff never expressed to the deputies that he could not read, that he did not understand the written requests and documents, and that he required or wanted an interpreter. The deputies believed, based on plaintiff's responses, that the written communication was effective. In sum, plaintiff cannot prove that Sheriff Ard intentionally discriminated against him.

(Doc. 42-1 at 20–21.)

### 2. Plaintiff's Memorandum in Opposition (Doc. 48)

Plaintiff responds that Defendant discriminated against Plaintiff because Defendant:

> (1) did not provide him with an equal opportunity to understand the removal and safeguarding his property; (2) did not provide him with an equal opportunity to understand his rights; (3) did not provide him with an equal opportunity to make a telephone call after booking; and (4) did not provide him with an equal opportunity to understand the Order of Protection prior to his attesting to his understanding.

(Doc. 48 at 1.)  Plaintiff thus claims there are questions of material fact that preclude summary judgment.

Plaintiff then asserts that, under Supreme Court precedent, the ADA imposes an "obligation to accommodate" and "reasonable modification requirement." (Doc. 48 at 11 (citing *Tennessee v. Lane*, 541 U.S. 509, 532–23 (2004).)  Plaintiff also points to *Pierce v. D.C.*, 128 F. Supp. 3d 250 (D.D.C. 2015) as support.

Plaintiff devotes considerable time to the fact that the ADA regulations can control whether there has been a violation of Title II of the ADA.  Plaintiff then points to some specific regulations which Plaintiff contends imposes an affirmative duty to accommodate individuals with disabilities, such as an affirmative duty to provide auxiliary aids and services "where necessary to afford qualified individuals with disabilities an <u>equal opportunity</u> to (1) participate in <u>and</u> (2) enjoy the benefits of the service, program, or activity at issue." (Doc. 48 at 14 (citing § 35.160(b)(1).)

Plaintiff also refers to the case of *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567 (5th Cir. 2002), to demonstrate intentional discrimination.  There, Plaintiff states, intentional discrimination was found for a hearing impaired arrestee, even though the plaintiff did not request an interpreter or specific auxiliary aid or service. (Doc. 48 at 15.)  Based on *Delano-Pyle*, Plaintiff maintains that he need not request an accommodation. Plaintiff then cites a more recent Fifth Circuit decision—*Perez v. Doctors Hospital at Renaissance, Ltd.*, 624 F. App'x 180 (5th Cir. 2015)—where the Fifth Circuit reversed the granting of summary judgment for a hearing impaired individual and noted that *Delano-Pyle* found evidence of intentional discrimination even without a request for an interpreter or auxiliary aid.   Plaintiff argues that these cases also demonstrate that summary judgment should be denied.

Plaintiff again urges that ADA regulations are enforceable and that Defendant is wrong in saying that the "ADA provides for reasonable accommodations, not preferred accommodation." Plaintiff asserts that the key is "whether the deaf individual was provided with an equal opportunity to participate"—that is, "an equal opportunity to communicate to the same extent as non-disabled persons." (Doc. 48 at 17.)

Moreover, according to Plaintiff, Defendant relies on inapplicable case law for the proposition that an accommodation is required only upon a request. Plaintiff argues that Defendant relies on cases from Title I of the ADA and points to a Ninth Circuit case that rejects any application of Title I to Title II cases. Plaintiff again pounds *Delano-Pyle, Perez*, and *Pierce.*

Returning to the facts, Plaintiff maintains that he was discriminated against for not being given a full opportunity to understand the removal and safekeeping of his property. Plaintiff noted in his objection that "Some inmates (though not all) are provided with a 'detailed explanation what's going on with the property.'" (Doc. 48 at 21 (citation omitted).) While Ard claims that deputies could communicate through hand gestures and written words, Plaintiff responds that Ard does not demonstrate how this is sufficient considering Plaintiff's limited exposure to English, inability to write coherently in English, and restrained hands.

Plaintiff also argues that Ard failed to provide Plaintiff with an equal opportunity to understand the Prisoner Booking Form, which included a statement that he had the right to a telephone call. According to Ard's deposition, it was best practice to sign this form. Plaintiff argues that the form has an "X" on the signature line which indicates that Defendant tried to get Alba-Cruz to sign it, but Defendant's failure to get an interpreter meant that Plaintiff did not understand it. Additionally, Plaintiff had no way of asking for an explanation. Plaintiff contests

Deputy William's statement that, as a general practice, he does not ask for signatures of the form and that he did not do so in this case. Plaintiff argues that the "X" next to the signature line is "the equivalent of a 'Sign Here' flag," especially when combined with Ard's testimony that it was "best practice" to sign it. Plaintiff maintains there is a question of fact here.

Plaintiff next points to the fact that he was not given an opportunity to make a phone call and not told of his right to do so. He was given a form, but a hearing person could have asked for an explanation of it. Further, according to Plaintiff, Ard testified that "things had somewhat normalized by that point" and inmates were given an opportunity to make phone calls. (Doc. 48 at 25.) Defendant argued that Plaintiff should have asked for a phone call, but Defendant fails to explain how or why Plaintiff would have known he had such a right.

Plaintiff then moves to the Order of Protection, which is provided to those accused of domestic abuse. Ard testified that "We try to explain documents, what they are, but stay out of the legal part of it." (Doc. 48 at 27–28.) Plaintiff asserts that he got "zero" explanation of the Order of Protection. (Doc. 48 at 27.) Ard's officers faxed this document to Sheriff Edwards with the instruction "HAVE INMATE EDISON ALBA-CRUZ SIGN ON THE LAST PAGE OF THE PROTECTIVE ORDER AND FAX BACK", but Ard provided no equal opportunity to discuss the nature of the document or for plaintiff to " 'read and understand' the instructions and rights" on the document. (Doc. 48 at 27.) Plaintiff also had no explanation for doing so.

Plaintiff also disputes Defendant's attempts to escape liability under § 35.130(b)(1). Ard's instruction constitutes an "other arrangement" under the regulation, as Ard faxing the Order to another facility to have them sign it "can be" standard practice. Plaintiff points to a Ninth Circuit case in support of this. The lack of remuneration does not change the fact that there is an "other relationship" between the two. Further, again, Ard had an affirmative duty

under the law to ensure equal opportunity, and Ard failed to comply with his obligation. Lastly, § 35.130(b)(1) is mandatory, and Plaintiff cannot escape liability by its investigation ("or lack thereof") of Plaintiff's disability. (Doc. 48 at 30.)

Plaintiff then focuses on how the issue of whether something was a reasonable accommodation is a question of fact for the jury. Further, many of the issues involved in this case involve credibility determinations that are also ill-suited for summary judgment.

Plaintiff next maintains that *Hans* and *Spurlock* are distinguishable. As to *Hans*, there was no evidence that plaintiff was unable to understand, and, indeed, she successfully completed a form on a computer screen. As to *Spurlock*, this case conflicts with *Delano-Pyle*, which found intentional discrimination without a specific request for an interpreter or auxiliary aid.

Plaintiff also asserts that there are questions of fact on whether there was "intentional discrimination". These include (1) "whether Defendant Ard provided Mr. Alba-Cruz with the auxiliary aids and services and that were necessary to provide him with 'equal opportunity' to participate in, and benefit from, the services Defendant Ard made available to hearing individual" and (2) "whether the communication Defendant Ard provided to Mr. Alba-Cruz (hand gestures) was 'as effective as' the communication provided to hearing persons." (Doc. 48 at 33.)

Plaintiff then moves to the Great Flood of 2016 argument. He argues that § 35.160(b)(1) has no "exigent circumstances" exception, and, indeed, the Department of Justice regulations specifically note the "need for effective communication is critical in emergency situations." (Doc. 48 (quoting 28 C.F.R. § Pt. 35, App. A.) Plaintiff also points to Ard's own testimony wherein he said that the LPSO had "numerous resources that were made available to use from other agencies"; that, as needs arose, the LPSO "would submit those needs to the Office of

Emergency Preparedness and they would see if those needs could be fulfilled; and that, by September 3, 2016, inmates were allowed phone calls and the ability to make them because "things had somewhat normalized by that point." (Doc. 48 at 35.) Plaintiff argues that Defendant has pointed to no evidence that the LPSO tried to assess Plaintiff's need for accommodations, secure a sign language interpreter, or use a Video Remote Interpreter, but that such efforts were thwarted by the emergency circumstances. Plaintiff argues that the reasonable inferences to be drawn from this support a denial of Plaintiff's motion.

Plaintiff closes by saying that the issue of whether Defendant violated the ADA is a "fact-intensive question inappropriate for resolution at the summary judgment stage. In fact, disregarding all evidence favorable to Defendant Ard that the jury is not required to believe leads to the inescapable conclusion that Defendant Ard discriminated against Mr. Alba-Cruz. Further, if this Court determines that there is a material dispute as to whether Defendant Ard failed to comply with the ADA regulations, then there is also a material dispute as to whether Defendant Ard committed intentional discrimination." (Doc. 48 at 35–36.)

### 3. Defendant's Reply Memorandum (Doc. 56)

Defendant responds that, when Plaintiff claims that he need only show a question of fact as to whether there was a violation of an ADA regulation, Plaintiff is "flatly wrong". The key is whether there was an intentional violation of the ADA. "The distinction goes directly to the heart of this case. It is not enough for plaintiff to simply show that plaintiff was treated differently than hearing inmates if that dissimilar treatment was unintentional or a result of mere negligence. Rather, it is plaintiff's burden to prove **intentional discrimination**." (Doc. 56 at 2 (emphasis in original).)

Defendant next argues there is no evidence of intentional discrimination. Plaintiff never requested an interpreter or other auxiliary aid, and the evidence showed that LPSO deputies believed their communication was effective at all times. There is no evidence that the deputies knew their attempts to communicate were not effective or that they ignored the need for an additional accommodation.

Defendant attacks each of the four grounds Plaintiff relies upon to show intentional discrimination. First, as to the Property Sheet, Plaintiff admits that the evidence shows that "some inmates (but not all) are provided with a 'detailed explanation what's going on with the property.'" (Doc. 56 at 3.) Thus, Plaintiff was not treated differently than most inmates. Plaintiff also misrepresents the Warden's testimony, as he specifically says that he could not say that each inmate was provided a detailed explanation. In any event, Plaintiff has not shown intentional discrimination because the deputy who completed the form testified that Plaintiff understood the process and never gave an indication to the contrary. Plaintiff could have indicated otherwise when he was given a chance to sign the form but instead "simply signed it without question." (Doc. 56 at 5.)

Second, as to the "Initial Arrest Report and Prisoner Book and Property Record," Plaintiff claims he was denied equal opportunity because he did not sign it; rather, the form has just an "x" on it without a signature. Defendant claims that this argument "amounts to nothing more than supposition and speculation, which is insufficient to support a motion for summary judgment." (Doc. 56 at 5.) Defendant asserts: "Importantly, plaintiff has no evidence to establish where this 'x' came from or who wrote it. He cannot prove that a Sheriff's Deputy put the 'x' on the form or for what purpose. Nor does he submit any evidence to establish that this form was ever even shown to plaintiff. The Court cannot infer these facts without evidence."

(Doc. 56 at 5.)  Rather, the only facts show that Williams said he does not have any arrestee sign the form and that he did not ask Cruz to do so.

Third, Plaintiff complains of the failure to give him an equal opportunity to make a phone call.  In response, Defendant urges that there is "no statutory or constitutional right to make a phone call," and, in any event, Plaintiff did not ask to make one, use a TTY machine, or utilize the video phone. Plaintiff never requested a pen and paper or any other means of making a request.  "Instead, plaintiff sat idly, without making any requests for auxiliary aids or to make a phone call, and without making any indication that he could not understand.  It is simply absurd to suggest that Sheriff Ard **intentionally** discriminated against him **because of his disability** when he made no attempt to make any of his alleged need for an accommodation known to anyone at any time." (Doc. 56 at 6 (emphasis in original).)  Further, Plaintiff could not use a standard telephone, so he is essentially complaining about the inability to us a video phone.  But this was unavailable at the time because of the flood.  Thus, the failure to provide Plaintiff with a video phone was the result of the flood, not intentional discrimination.

Fourth, as to the request by the LPSO Deputy via fax to the Catahoula Correction center to sign the protective order, Defendant argues there is not a single shred of evidence that Ard of any of his employees had any knowledge or indication that plaintiff could not read written English.  To the contrary, Defendant has submitted evidence that they did communicate through written notes and that such communication was effective.  Further, there is no evidence of who sent the fax at issue and under what circumstances, so Plaintiff cannot establish that the person who sent the form knew of the disability from Plaintiff's short time in custody.  Thus, there can be no intentional discrimination.  Lastly, Plaintiff ignores the facts that the disability would be obvious to Sheriff Edwards, and Ard had no authority to control Sheriff Edwards.

Defendant also asserts that, while Plaintiff's failure to request an interpreter is not dispositive, that failure is relevant to his claim. Defendant states, "without a request by plaintiff of some other auxiliary aid, and without any indication by him that he was having difficulty understanding, plaintiff cannot possibly prove that defendant knew of a harm to his federally protected rights and failed to act." (Doc. 56 at 9.) Defendant further contends:

> This case boils down to one where plaintiff never made any request for an accommodation and never indicated any need for one, but now seeks money damages for defendant's alleged failure to recognize that need. Plaintiff essentially remained silent as to his alleged need for auxiliary aids, and now seeks money damages from this defendant for not guessing what those needs were. Had plaintiff made his needs known, or requested an auxiliary aid, and had defendant ignored those requests, such actions would surely be used as evidence to show intentional discrimination. *See, e.g., Perez,* , 624 F. App'x at 185 (where the Court noted that the fact that an interpreter was requested on several occasions, but not provided, was relevant to whether defendant intentionally discriminated). It only follows that evidence conclusively establishing that plaintiff did not ask for any such accommodation must [be] relevant to the determination that no intentional discrimination occurred in this case.

(Doc. 56 at 9.)

Lastly, Defendant distinguishes *Delano-Pyle* on the grounds that, in that case, the officer had clear grounds for knowing that the arrestee could not understand and yet became "annoyed" and continued to instruct the arrestee verbally in the same manner. The *Delano-Pyle* officer even admitted that he knew the form of communication was not effective. Conversely, here, no officer became "annoyed" or continued to use verbal communications that obviously were not effective. Nor did the officers in this case know that the communication was not effective; rather, they had a subjective belief that effective communications were achieved. Plaintiff thus fails to provide a single case that is analogous, while the Defendant provides both *Spurlock* and *Hans*. Defendant concludes:

Plaintiff has submitted absolutely no evidence to contradict that submitted by Sheriff Ard. Specifically, that evidence establishes that the deputies who interacted with Mr. Abla-Cruz were able to effectively communicate with plaintiff through hand gestures and writings. There was never any indication made by plaintiff that he did not understand the communications, and plaintiff never asked for an interpreter or any other auxiliary aid. The summary judgment evidence not only disproves any claim by plaintiff that defendant intentionally discriminated against him (or were deliberately indifferent to his communication needs), the evidence actually affirmatively establishes that defendant attempted to communicate effectively with plaintiff. Without presenting evidence that disputes these facts, plaintiff has failed to overcome summary judgment, and his claims must be dismissed.

(Doc. 56 at 11–12.)

**B.  Applicable Law**

"Title II of the ADA provides: '[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *Windham v. Harris Cty., Tex.*, 875 F.3d 229, 234–35 (5th Cir. 2017) (quoting 42 U.S.C. § 12132). "[Title II of the ADA] further defines 'public entities' to include local governments." *Windam*, 875 F.3d at 235 (citing § 12131(1)(A)). "And it creates a private right of action against them for monetary and equitable relief." *Windam*, 875 F.3d at 235 (citing § 12133). "These provisions allow individuals to sue local governments for disability discrimination committed by police in non-exigent circumstances." *Windam*, 875 F.3d at 235 (citing *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 570–71, 574–76 (5th Cir. 2002); *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000)).

Similarly, § 504 of the Rehabilitation Act provides in relevant part: "No otherwise qualified individual with a disability in the United States . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Title II of the ADA and § 504 of the RA "have identical remedial schemes" and "are generally interpreted interchangeably[.]" *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 573–74 (5th Cir. 2018) (citations omitted); *see also Delano-Pyle*, 302 F.3d at 574 (essentially the same).

To demonstrate a violation of either Title II of the ADA or § 504 of the RA, "a plaintiff must prove '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.' " *Miraglia*, 901 F.3d at 574 (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)); *Windam*, 875 F.3d at 235 ("To make out a prima facie case under Title II, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." (quoting *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)).

Here, it is undisputed that Plaintiff, as a profoundly deaf individual, has a qualified disability within the meaning of the ADA. Further, for purposes of this motion, the Court will assume without deciding that the second requirement has been satisfied.

With respect to the third requirement, "a plaintiff can recover money damages only if he proves the defendant committed a violation of the ADA or RA and that the discrimination was intentional." *Miraglia*, 901 F.3d at 574 (citing *Delano-Pyle*, 302 F.3d at 574); *see also*

*Windham*, 875 F.3d at 235 n. 5 ("To recover compensatory damages for disability discrimination under Title II of the ADA, a plaintiff must also show that the discrimination was 'intentional' in the sense that it was more than disparate impact." (citing *Delano-Pyle*, 302 F.3d at 574)). The Fifth Circuit recently stated that it has "previously declined to adopt a specific standard of intent." *Miraglia*, 901 F.3d at 574–75 (citing *Perez v. Doctors Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 184 (5th Cir. 2015) (per curiam) (stating that "[w]e did not define what we meant by intent in *Delano–Pyle*")). In *Miraglia*, the Fifth Circuit again found that it "need not delineate the precise contours in this case." *Id.* at 575. Rather, the appellate court "reli[ied] on the widely accepted principle that intent requires that the defendant at least have actual notice of a violation." *Id.* The Fifth Circuit continued:

> We previously seem to have required that a plaintiff prove. . . something more than "deliberate indifference" to show intent. *See Delano–Pyle*, 302 F.3d at 575; *see also Perez*, 624 F. App'x at 186 (noting that this court's intentional discrimination analysis did not apply the deliberate indifference standard). Other circuits use the deliberate indifference standard. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262–63 (3d Cir. 2013) (collecting citations from five other circuits and adopting the deliberate indifference standard); *but see Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 291 (1st Cir. 1998) (seemingly applying a much more difficult standard when it rejected an ADA claim because there was "not the slightest hint that the [defendant] was prompted by malice or hostility toward [the plaintiff] or toward the disabled"). But what is common between our courts and other courts is that a defendant must have notice of the violation before intent will be imputed. *See Delano-Pyle*, 302 F.3d at 575–76 (affirming damages based on a defendant's knowledge of the plaintiff's disability and his decision not to accommodate him); *Perez*, 624 F. App'x at 185 (affirming damages when a defendant "ignored clear indications" of the plaintiff's impairment and "failed to provide an effective form of communication"); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012) (adopting "the twin requirements that the defendant-entity had actual notice that it was in violation of [the law] and had an opportunity to rectify the violation" for purposes of the RA). As the Ninth Circuit said, evidence that an entity "lack[ed] knowledge and understanding" about compliance requirements does not "even suggest" deliberate indifference. *Ferguson v. City of Phoenix*, 157 F.3d 668, 675 (9th Cir. 1998).

*Miraglia*, 901 F.3d at 575.

Thus, "[a] critical component of a Title II claim for failure to accommodate . . . is proof that 'the disability and its consequential limitations were known by the [entity providing public services].' " *Windham*, 875 F.3d at 236 (quoting *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015)).[2] "Mere knowledge of the disability is not enough; the service provider must also have understood 'the limitations [the plaintiff] experienced . . . *as a result* of that disability.' " *Windham*, 875 F.3d at 236 (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) (emphasis added)).[3] "Otherwise, it

---

[2] Contrary to Plaintiff's arguments, the Fifth Circuit has looked to "failure to accommodate" law in Title I of the ADA in analyzing Title II claims. *See Windham*, 875 F.3d at 235–36. The *Windham* court specifically stated:

> [Plaintiff] attempts to satisfy the third prong on a theory of "failure to accommodate." That theory is expressly codified in Title I of the ADA (governing employment), which defines "discriminat[ion] ... on the basis of disability" to include "not making reasonable accommodations [for a disabled employee's] known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). Although Title II contains no similarly explicit definition, *see* 42 U.S.C. §§ 12131, 12132, our cases recognize that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II. *See Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 & n.11 (5th Cir. 2005) ("[Title II] impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." (citing 42 U.S.C. § 12131)); *see also Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 Fed. Appx. 214, 215 (5th Cir. 2015) (adapting the failure-to-accommodate standard from Title I to Title II); *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015) (same).

*Id.*, 875 F.3d at 235. The Fifth Circuit also noted that "[o]ther circuits share this view." *Id.* at 235 n. 6 (collecting cases). Lastly, the appellate court said, "We have also recognized Title II claims in the specific context of police officers who fail reasonably to accommodate the known limitations of disabled persons they detain." *Id.* at 235–36 (citing *Delano-Pyle*, 302 F.3d at 570–71, 575–76 ("affirming jury verdict that police officers discriminated against deaf arrestee by failing to accommodate the limitations arising from his inability to hear" (case description quoted from *Windham*, 875 F.3d at 236 n. 7)); *Hainze*, 207 F.3d at 802 ("Once the area was secure and there was no threat to human safety, the Williamson County Sheriff's deputies would have been under a duty to reasonably accommodate Hainze's disability...."); *Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009) ("In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees.")).

[3] As the Fifth Circuit noted, "the ADA requires [public entities] to reasonably accommodate limitations, not disabilities." *Windham*, 875 F.3d at 236 n. 10 (citing *Taylor*, 93 F.3d at 164). For instance, "[a] hearing-impaired worker may require significant accommodations while working as a telephone operator, but have no difficulty working in an assembly line, despite the same disability." *Windham*, 875 F.3d at 236 n. 10 (citing *Taylor*, 93 F.3d at 164). "In Title II cases, 'the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services, or—in the context of police detentions, causes him to suffer greater injury or indignity than other detainees." *Windham*, 875 F.3d at 236 n. 10 (internal citations, quotations, and alterations omitted).

would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances." *Windham*, 875 F.3d at 236 (citing *Taylor*, 93 F.3d at 164). "Thus, because the ADA does not require clairvoyance, the burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms." *Windham*, 875 F.3d at 236–37 (internal citations, quotations, and alterations omitted).

"When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Windham*, 875 F.3d at 237 (citing *Taylor*, 93 F.3d at 164). Even if "a jury could find that the officers knew or should have known [plaintiff] suffered from a . . . . disability[,] . . . knowledge of a disability is different from knowledge of the resulting limitation. And it certainly is different from knowledge of the necessary accommodation. . . . To prevail, [plaintiff] must adduce evidence that all three were or should have been obvious." *Windham*, 875 F.3d at 238 (internal citations omitted). This is a "narrow exception" to the above general rule that '[i]f the [plaintiff] fails to request an accommodation, the [public entity] cannot be held liable for failing to provide one.' " *Windham*, 875 F.3d at 239 (citing *Taylor*, 93 F.3d at 165).

The Fifth Circuit has indicated that deafness *can* meet the three requirements for "open, obvious, and apparent." *See Perez*, 624 F. App'x at 185 (stating, "In *Delano-Pyle*, the plaintiff did not show he ever requested an interpreter or auxiliary aid, yet we concluded that the failure to provide an effective form of communication was evidence of intentional discrimination."); *Windham*, 875 F.3d at 238–29 (stating in dicta that it "may be true of well-understood and outwardly visible disabilities like, say, blindness, deafness, or being wheelchair-bound" that the

"disability, limitation, and necessary accommodation are of a kind that would still have been 'open, obvious, and apparent' even if [plaintiff] had never attempted to explain them," and distinguishing *Delano-Pyle* on the grounds that the plaintiff's deafness in *Delano-Pyle* was "far more readily apparent" than the condition in *Windham* because "That deafness limits a person's ability to understand oral commands is plain."). However, this appears to depend on the circumstances. *Cf. Windham*, 875 F.3d at 238–39 (again, writing it dicta that deafness "may" meet three requirements, and stating in its distinction of *Delano-Pyle* (1) that the officers in that case "testified that they understood that the plaintiff's disability prevented him from hearing, yet they continued to give him oral instructions regardless" (citing *Delano-Pyle*, 302 F.3d at 575–76), and (2) that it is "plain" that "deafness limits a person's ability to understand *oral* commands" (emphasis added)); *Robertson v. Las Animas County Sheriff's Dep't,* 500 F.3d 1185, 1198-1200 (10th Cir. 2007) (finding questions of material fact as to defendants' knowledge that an accommodation was necessary (including obviousness of need) based on "the totality of the circumstances" (cited with approval by *Windham*, 875 F.3d at 238)).

### C.  Application

Again, Plaintiff argues that Sheriff Ard discriminated against him by failing to give Plaintiff an equal opportunity (1) "to understand the removal and safeguarding [of] his property"; (2) "to understand his rights"; (3) "to make a telephone call after booking"; and (4) "to understand the Order of Protection prior to his attesting to his understanding." (Doc. 48 at 1.) Defendant seeks dismissal of each of these theories.

In sum, having carefully considered the law, facts in the record, and arguments of the parties, the Court finds that Defendant is entitled to summary judgment on each issue. As Defendant argues, the heart of this case is whether Sheriff Ard committed intentional

discrimination by acting with "something more than 'deliberate indifference[.]' " *Miraglia*, 901 F.3d at 575. Plaintiff has failed to create a genuine issue of material fact on this issue. The Court will address each of Plaintiff's theories in turn.

### 1. Property Sheet and Booking Form

First, Plaintiff's claims with respect to the property sheet and booking forms fail. It is undisputed that "[a]t no time during his arrest, booking, or detention by the Livingston Parish Sheriff's Office did [Plaintiff] request a sign language interpreter (or any other auxiliary aid)." ((*DSUMF* ¶ 12, Doc. 42-2; *PSCUF* ¶ 12, Doc. 48-1.) Thus, per *Windham*, Defendant must have "knowledge of [the] disability[,] . . . knowledge of the resulting limitation[,] [and] . . . knowledge of the necessary accommodation. . . . To prevail, [plaintiff] must adduce evidence that all three were or should have been obvious." *Windham*, 875 F.3d at 238 (internal citations omitted).

This is critical. While the above case law demonstrates that deafness *can be* an open and obvious condition, all three of the above requirements must still be met. Here, the third one is not, as Plaintiff has failed to demonstrate that the need for a necessary reasonable accommodation was obvious in this case.

Specifically, Deputy Hotard testified that, after he cataloged and documented each item on the Arrestee Property Transfer Inventory form, he pointed to its description to read. (*DSUMF* ¶ 8, Doc. 42-2; *PSCUF* ¶ 8(c), Doc. 48-1; Hotard Dec. ¶ 6, Doc. 42-4.) When Hotard finished cataloging Plaintiff's personal property, Hotard signed the form near the bottom and gestured for Plaintiff to do the same. (*DSUMF* ¶ 8, Doc. 42-2; *PSCUF* ¶ 8(e), Doc. 48-1.) Hotard stated that Plaintiff "signed the form without indicating that he could not read or understand its contents or purpose." (Hotard Decl. ¶ 6, Doc. 42-4.) Under these circumstances, the Court finds that it was not obvious to Defendant that a reasonable accommodation was necessary.

The Court has reviewed the above evidence concerning whether Plaintiff gave an indication that he could not understand the forms, and the Court finds that no reasonable juror could conclude that the Plaintiff's inability to understand was obvious to the deputies. Williams and Hotard's testimony is unequivocal: "At no time during [Plaintiff's] arrest or the booking process did Mr. Alba-Cruz make any indication to [Williams] or any other person that he could not read written English." (Williams Decl. ¶ 14, Doc. 42-3; *see also* Hotard Decl. ¶¶ 8–14.) Williams continued: "In fact . . ., [Williams'] interactions with [Plaintiff], and specifically his ability to read the information [Williams] needed on the Initial Arrest Report and Prisoner Booking and Property Record, caused [Williams] to believe that [Plaintiff] was able to read and understand written English since [Plaintiff] provided appropriate responses." (Williams Decl. ¶ 14, Doc. 42-3.) Williams also said that "At no time during his arrest or the booking process did [Plaintiff] make any indication to [him] or any other person that he did not understand why he was arrested or the booking process, nor did it appear to [Williams] that [Plaintiff] did not understand what was being communicated to him." (Williams Decl. ¶ 15, Doc. 42-3.)

Further, Plaintiff was asked several times whether he ever told anyone at Livingston that he did not know how to read, and Plaintiff responded "No." (Pl. Dep. 52:17–53:7; 45:14–16; Pl. Dep. 54:11–18, Doc. 48-2.) Plaintiff also acknowledged that he failed to disclose that he did not understand the paper he signed and did not write notes to the deputies or ask for a paper or pen to write a note on. (Pl. Dep. 50:1–24, Doc. 48-2.) This is true despite the fact that Plaintiff specifically admitted that he was able to write the sentences "I cannot read," "I do not understand," and "I need an interpreter." (Pl. Dep. 23:7–24:8, Doc. 48-2.)

On top of this, Plaintiff admitted that he provided the deputies with the requested information. Plaintiff stated:

> Q.     Did you ever write anything to the deputies? . . . . All of the questions I'm
>        asking right now, I'm asking about when you were brought to Livingston
>        immediately after your arrest, before you were brought anywhere else.  At
>        that time, did you write any notes or questions to the deputies?
>
> A.     Really, I would say they asked me for my phone number.  . . . The police
>        asked me for my phone number, and I gave it to them.  Second, they just
>        asked me, like, little simple things – police.  It was short, like not elaborate,
>        like Social Security number, SSN, and I wrote that down.  How old are you?
>        Age – they put 'age,' and I told them my age; and then they asked me about
>        medicine, and it was a whole paragraph there.  I really wasn't too sure about
>        what they were asking, so – and that was it.
>
> Q.     Did you ever tell them that you could not read?
>
> A:     No. I don't know if I told them.  I just said, "IDK," I don't know.  They'd
>        show me something, and I'd say, "IDK," I don't know.
>
> Q.     Did you ever tell them, "I don't understand"?
>
> A.     Really not. I mean, I just put, "IDK," and "I don't know."

(Pl. Dep. 37:5–38:22, Doc. 48-2.)  A reasonable juror could not find from this and the other parts

of Plaintiff's testimony that his need for a necessary reasonable accommodation was "open,

obvious, and apparent."

The Court also agrees with Defendant that this case is a far cry from *Delano-Pyle*.  There,

again, the Fifth Circuit upheld a jury verdict finding an ADA violation for a deaf individual who

was arrested for driving while intoxicated following his failure to pass various field sobriety

tests. *Delano-Pyle*, 302 F.3d at 570–71, 576.  In reaching its decision, the appellate court

explained:

> It is clear from the videotape of the accident that no matter how many times [officer]
> Daniel repeated himself and no matter how loudly he spoke, [deaf plaintiff] Pyle
> could not understand most of what he was saying. For example, while Daniel was
> demonstrating the sobriety tests, he told Pyle several times not to start the test until
> after he was finished demonstrating. Nonetheless, each time, Pyle started to

perform the task while observing Daniel. Instead of viewing these actions as an indication that Pyle was not understanding his verbal commands and trying a more effective form of communication, Daniel only became annoyed and continued to further instruct Pyle through verbal communication. When asked whether his communications with Pyle were effective in that Pyle understood him, Daniel answered "[w]ell, I don't know his state of mind. I knew he had a hearing problem."

In addition, during trial, Pyle's counsel asked Daniel if he was speaking quickly when informing Pyle of his legal rights. Daniel responded "[y]es, probably so, yes." Pyle's counsel proceeded to inquire as to whether Daniel believed this form of communication was effective. Daniel answered "[s]omewhat, but no." Further, Daniel acknowledged that an officer must continue to provide Miranda warnings or whatever warnings required to be given an arrestee until the officer has a genuine belief that the arrestee actually understood him. However, Daniel admitted that he did not know whether Pyle understood his rights as verbally communicated.

*Delano-Pyle*, 302 F.3d at 575–76.

While *Delano-Pyle* is similar with respect to the disability involved, it is distinguishable in the sense that this case involved written instructions given to Plaintiff. Further, unlike *Delano-Pyle*, the officers in this case did not continue to give ineffective commands despite actual knowledge of the plaintiff's disability, limitation, and ineffectiveness of the methods of communication provided. Here, as demonstrated above, the officers reasonably believed from Plaintiff's conduct that he could read the forms.

Rather, the Court finds Defendant's cases more persuasive. In *Spurlock v. Simmons*, 88 F. Supp. 2d 1189 (D. Kan. 2000), an inmate claimed discrimination under the ADA and RA because the Defendant did not provide him with an interpreter. *Spurlock*, 88 F. Supp. 2d at 1195–96. The district court rejected this claim and granted summary judgment. *Spurlock*, 88 F. Supp. 2d at 1195–96. The court explained that prison "officials who worked with plaintiff state that they did not have difficulty communicating with him. Further, other than plaintiff's conclusory allegations, the record does not suggest that plaintiff ever requested an interpreter or mentioned the fact that he was having difficulty communicating with prison staff[.]" *Spurlock*, 88 F. Supp.

2d at 1195.  The court found that, "[w]ithout such evidence, defendants are entitled to summary judgment on plaintiff's claim that they discriminated against him by failing to provide an interpreter." *Id.*

As in *Spurlock*, Plaintiff gave no indication that he was "having difficulty communicating with prison staff," despite the fact that he was able to write the sentences "I cannot read," "I do not understand," and "I need an interpreter." (Pl. Dep. 23:7–24:8, Doc. 48-2.)  Under the circumstances, the officers did not know that the accommodations they provided were ineffective, so they cannot be deliberately indifferent.

Similarly, in *Hans v. Board of Shawnee County Commissioners*, No. 16-4117, 2018 WL 1638503, at *1 (D. Kan. Apr. 5, 2018), the Court granted summary judgment against a deaf individual who had been arrested for domestic battery, jailed, and claimed discrimination.  The district court found that a reasonable jury could not conclude that defendants were deliberately indifferent or that plaintiff was "denied the ability to communicate." *Hans*, 2018 WL 1638503, at *20.  The district court explained:

> The summary judgment record shows that during plaintiff's arrest, Corporal Beightel and Deputy Dobler communicated with plaintiff using a combination of written notes, gestures, and verbal utterances. These methods achieve effective communication in many circumstances. *See Bircoll*, 480 F.3d at 1087. During screening at the DOC, Officer Hutting used written materials to complete the intake questions with plaintiff. To complete the suicide screening, Sergeant Anderson used a form displayed on a computer screen, and he used written notes. These techniques permitted him to learn that plaintiff had been admitted for psychiatric treatment at Valeo. These same techniques enabled Sergeant Anderson to identify plaintiff's current medications. The methods used by DOC officers constituted the auxiliary aids, or slight variations of them, identified in 28 C.F.R. § 35.104(1).
>
> Once in her cell, plaintiff communicated effectively with DOC personnel by gesturing requests for toilet paper and water. And jail personnel provided her with both items she requested. These attempts to communicate show no deliberate indifference to effective communication. Instead, they demonstrate attempts by defendants' employees to communicate effectively with plaintiff. And although

> plaintiff claims "she was denied the ability to communicate," she has failed to come forward with any evidence that she was unable to communicate with defendants' employees. Defendants' failure to provide a sign language interpreter does not constitute deliberate indifference because defendants' employees effectively used other methods of communication to communicate effectively with plaintiff. And from these summary judgment facts, no reasonable jury could find that defendants were deliberately indifferent to a strong likelihood that its policies would cause ineffective communication.

*Hans*, 2018 WL 1638503, at *20. The district court reached this conclusion despite the fact that, as in this case, plaintiff offered an expert opining that "English language modes of communication, including 'speech, lipreading, reading and writing do not constitute effective modes of communication for [plaintiff].' " *Hans*, 2018 WL 1638503, at *1.

The same reasoning applies here. As demonstrated above, Williams and Hotard were able to obtain the information they sought through written notes and forms. They had no basis for knowing that Plaintiff could not understand the written materials they provided to him. Without more, summary judgment is appropriate, as it was in *Hans*.

The Fifth Circuit's guidance in *Greer v. Richardson Independent School District*, 472 F. App'x 287, 296 (5th 2012) is also instructive. There, the court explained that a disabled person does not have the burden of actively requesting accessible accommodations in all situations. *Greer*, 472 F. App'x at 296. "As [the Fifth Circuit] , and courts in other circuits have held, there is a common sense aspect to determining whether a public entity has provided accommodations for a disabled individual, part of which requires the public entity be made aware of the inadequacy of the accommodations provided." *Greer*, 472 F. App'x at 296 (citing *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007) ("This is a 'duty dictated by common sense lest a disabled [individual] keep his disability a secret and sue later for failure to accommodate.' ") (alteration in original) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th

Cir. 1996)). "However, a disabled person's failure to expressly 'request' an accommodation is not fatal to an ADA claim where the defendant otherwise had knowledge of the individual's disability and needs but took no action." *Greer*, 472 F. App'x at 296 (citing *McCoy v. Texas Dep't of Criminal Justice*, No. C–05–370, 2006 WL 2331055, at *7–8 (S.D. Tex. Aug. 9, 2006) (collecting cases from multiple circuits)). "Taken together, there is a balance to be struck between a disabled individual's need to request accommodations when limitations are not obvious or apparent and a public entity's duty to provide accommodations without further notice or a request." *Greer*, 472 F. App'x at 296 (citing *McCoy*, 2006 WL 2331055, at *7–8).

Thus, in *Greer*, the Fifth Circuit affirmed the granting of summary judgment in favor of the defendant and against a person in a wheelchair who alleged that she was denied an equal opportunity to watch a high school football game at a stadium. *Greer*, 472 F. App'x at 288. The appellate court explained:

> Under the facts here, when a disabled individual such as Greer attends one event at a venue she was otherwise unfamiliar with, that person does not by default gain a prima facie case of discrimination under Title II merely because she is dissatisfied with her seating location and makes no effort to ask the venue's staff as to where alternative accessible seating is located or if she and her family can be accommodated. By Greer's own admission, she was able to access all aspects of the stadium she attempted to use during her visit—the parking lot, the sidewalks, the ticket booth, the concession stand, and one of the several accessible seating areas. Her argument focuses on her inability to see the whole game from her viewing point for the game without giving RISD any opportunity to reaccommodate her or her companions such that she could have a better viewpoint. Considering the size and types of events held at [the stadium], such as football games and track meets, it is unclear how RISD officials would be able to develop a universal accessibility plan that would always satisfy the viewing preferences for disabled individuals other than by what they have already done—providing several alternative accessible seating areas. Stated differently, simply asking a few questions of the event venue's staff for more suitable accommodations is likely to be more effective and consistent with case law than remaining silent and resorting to a Title II discrimination claim in the federal court system.

*Greer*, 472 F. App'x at 296–97.

Similar reasoning applies here. Deputies Williams and Hotard attempted to accommodate Plaintiff's disability through written communications. By Plaintiff's own admission, they obtained the information they sought. And there is no question of fact that Plaintiff gave no indication that he could not understand. Consequently, no reasonable jury could conclude that Defendant was deliberately indifferent and discriminated against Plaintiff by reason of his disability.

Finally, the Court rejects Plaintiff's reliance on the ADA regulations. *Hans* granted summary judgment despite recognizing the obligations imposed by these regulations because there was no deliberate indifference. *See Hans*, 2018 WL 1638503, at *19–20. Additionally, in *Spurlock*, the court also referenced regulatory obligations, yet the court granted summary judgment partly because "the record [did] not suggest that plaintiff ever requested an interpreter or mentioned the fact that he was having difficulty communicating with prison staff[.]" *See Spurlock*, 88 F. Supp. at 1195. While not as overt as *Hans*, *Spurlocks*'s reliance on this fact also goes toward the question of the defendant's knowledge, a key component of deliberate indifference. *Spurlock*, 88 F. Supp. at 1195–96. Further, the Court believes that the Fifth Circuit case law described above provides the appropriate standard and that this standard requires "something more than 'deliberate indifference[.]' " *Miraglia*, 901 F.3d at 575.

Because Plaintiff has failed to demonstrate a question of fact with respect to these claims, summary judgment is appropriate. Accordingly, Plaintiff's claims with respect to the property sheet and booking form are dismissed.

### 2. Telephone

For similar reasons, Plaintiff's claim that he was denied an equal opportunity to make a telephone call fails. Plaintiff never requested a sign language interpreter, a specific auxiliary aid

for communication, a telephone call, the use of a video phone, or the use of a TTY machine. (Williams Decl. ¶¶ 16–19, Doc. 42-3; Hotard Decl. ¶¶ 8–14, Doc. 42-4; Pl. Dep. 66:1–25; 49:16–25, Doc. 48-3.) Thus, again, Plaintiff must show that the disability, limitation, and necessary reasonable accommodation was "open, obvious, and apparent." *Windham*, 875 F.3d at 237 (citing *Taylor*, 93 F.3d at 164).

Again, Plaintiff fails to satisfy the last requirement. The Initial Arrest Report and Prisoner Booking and Property Record form shown to Plaintiff specifically advises arrestees that they "have the right to one telephone call, after [they] have completed the Booking Procedure." (Pl. Ex. H, Doc. 48-11.) There is no evidence that any other inmate was given any more information beyond this. And, as demonstrated above, no reasonable juror could conclude that Williams and Hotard knew that Plaintiff was unable to read this instruction. Thus, Plaintiff has failed to demonstrate that Williams and Hotard (and thus Defendant) knew that they needed to provide further information to the Plaintiff to inform him of his ability to request and make a phone call. Again, without more, Plaintiff has failed to satisfy this "narrow" exception, *Windham*, 875 F.3d at 239, and to show "something more than 'deliberate indifference,' " *Miraglia*, 901 F.3d at 575, so summary judgment is warranted.

Even putting this aside, the opportunity to be informed of the right to make a call is different than the opportunity to make a call when requested. This is important because Plaintiff presents no evidence that non-disabled inmates were given an opportunity to make a phone call even if they did not request one. Had Plaintiff requested a call, then Rushing's testimony may have at least created a question of fact as to whether Livingston would have an obligation to obtain a video phone from the Office of Emergency Preparedness. (Rushing Dep. 23:7–18; 24:19–22, Doc. 48-3.) But, without any request by Plaintiff to exercise his right to make a phone

46

call, Defendant cannot be said to have discriminated against Plaintiff by reason of his disability. Again, summary judgment is warranted.

### 3. Catahoula

Finally, the Court finds that Plaintiff has failed to demonstrate any intentional discrimination with respect to the Order of Protection faxed to the Catahoula Correctional Facility. Again, the basis of Plaintiff's claim is the ADA regulation providing that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements," discriminate against individuals with disabilities. 28 C.F.R. § 35.130(b).

As amply demonstrated above, no reasonable juror could conclude that anyone at Livingston (including the unknown individual who sent the fax to Catahoula) had any basis for knowing that Plaintiff was unable to read the written instructions provided to him. Thus, Plaintiff cannot show that Livingston committed "something more than 'deliberate indifference' " by asking Catahoula to obtain Plaintiff's signature without instructions to provide an interpreter. *Miraglia*, 901 F.3d at 575. Again, the necessary reasonable accommodation was not obvious or known to Defendant. Accordingly, even assuming that Livingston's action in faxing the court-issued Order of Protection to Catahoula for signature constituted an "other arrangement" under the above regulation, summary judgment on this claim is warranted and will be granted.

**IV.    Conclusion**

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 42) filed by Defendant

Jason Ard is **GRANTED**, and all claims by Plaintiff Edison Jhon Alba-Cruz are **DISMISSED**

**WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all pending motions (Docs. 64, 66, 78, 79) are

**DENIED AS MOOT.**

Signed in Baton Rouge, Louisiana, on <u>December 7, 2018</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**